Filed 10/11/13  P. v. Jackson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

<table><tr><td>California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.</td></tr></table>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>RICARDO JACKSON,<br><br>     Defendant and Appellant. | B237108<br><br>(Los Angeles County<br>Super. Ct. No. BA349750) |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County, Lance A. Ito, Judge.  Affirmed.

Tara Hoveland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven E. Mercer and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Ricardo Jackson appeals his conviction by a jury of conspiracy to commit murder. Jackson claims he was convicted in violation of his state and federal due process rights because California does not have jurisdiction. We affirm.

## BACKGROUND

On November 9, 1997, the dead body of Janice Carol King was found in an alley in Los Angeles with a single gunshot wound to the back of her head. The body lay prone over a photo album containing photos of four young children. Almost simultaneously, in Durham, North Carolina, police found Lori Champion and Terry Jackson[1] shot to death at Terry's home. Shortly thereafter, Durham police received a report that Champion's house was on fire.

The three murders resulted in an information filed by the Los Angeles County District Attorney's Office on May 26, 2009, charging Jackson with first degree murder of King (Pen. Code,[2] § 187, subd. (a); count 1), and one count of conspiracy "with another person . . . whose identity is unknown" to commit murder (§§ 182, subd. (a)(1), 187, subd. (a); count 2). The information further alleged as to both counts 1 and 2 that Jackson personally used a handgun. (§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1).)

The information charged seven overt acts in furtherance of the conspiracy (count 2), all occurring in California and North Carolina on November 9, 1997. The acts alleged to have taken place in North Carolina on November 9, 1997 were that unidentified coconspirators took Champion to a house in Durham to look for money they believed Champion and King had stolen from them; took Champion to another house to find the money they believed she and King had stolen from them; demanded from the residents of the second house the money and the whereabouts of Michael; and then murdered Champion and Terry when the unidentified coconspirators were unable to obtain any money. The three overt acts alleged to have occurred in California are as

[1] Terry Jackson, the murder victim, and his brother Michael Jackson, who testified at trial, were not related to Jackson. To avoid confusion, we refer to Terry and Michael by their first names only, and we intend no disrespect.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

follows. Overt act number 1 alleged: "On November 9, 1997, Ricardo Jackson, while in Inglewood, California, had a telephone conversation with his brother Pablo Jackson in which they decided to kill Janice Carol King and Lori Champion because they had lost or stolen drug money." Overt act number 6 alleged: "On November 9, 1997, Ricardo Jackson drove Janice Carol King from a hotel room in Inglewood, California to an alley next to 1745 West 60th Place, Los Angeles, California, in order to murder her." Overt act number 7 alleged: "On November 9, 1997, in an alley at 1745 West 60th Place, Los Angeles, California Ricardo Jackson shot Janice Carol King in the back of the head with a handgun, murdering her."

Jackson pleaded not guilty and denied all allegations. A jury trial was held.[3] The jury found Jackson guilty of conspiracy to commit murder as alleged in count 2, but acquitted Jackson of King's murder as alleged in count 1. The jury found five of the pleaded overt acts to be true, including overt act number 1, the telephone conversation in Inglewood, California, during which Jackson and his brother Pablo decided to kill King and Champion. The jury found not true overt acts 6 and 7, which, respectively, and as quoted above, alleged that Jackson drove King to an alley in Los Angeles intending to murder her, and then murdered her in the alley with a shot with a handgun to the back of the head. The firearm enhancement for personal use of a handgun was found not true. Each juror affirmed the verdicts and the true findings.

After his conviction Jackson made a motion to represent himself, which the trial court granted. Jackson filed a pro. per. motion for a new trial, claiming that his conviction of conspiracy to commit murder (count 2) and the jury's finding that overt acts 6 and 7 were "untrue" was inconsistent with his acquittal of murder in count 1, and that his conviction violated section 184 and was a denial of his right to due process. The trial court denied Jackson's motion for a new trial on November 2, 2011. Jackson then

_____

[3] Jackson was represented by counsel at trial, although beginning on October 5, 2009, he had proceeded in pro. per. during many of the pretrial proceedings. The trial court revoked his pro se status on May 27, 2010, and denied his subsequent motions to restore his pro se status during the trial.

3

relinquished his pro se status, and his former counsel was reappointed for sentencing. On November 4, 2011, appointed counsel refiled a motion to set aside the verdict and for new trial, arguing that the jury's acquittal on the murder count was inconsistent with the guilty verdict on the conspiracy count.[4] The court denied Jackson's request to once again proceed in pro. per. The court sentenced Jackson to state prison for a term of 25 years to life, making a recommendation that Jackson never be released on state parole: "He's a manipulative, conniving, thoroughly amoral individual, and he should never be released on parole." Jackson filed this timely appeal.

Jackson argues that the evidence was insufficient to convict him of conspiracy, and that the jury failed to find all the elements of conspiracy beyond a reasonable doubt, leaving California without jurisdiction under section 184. We summarize the evidence at trial.

## I.     Prosecution's Case

On November 9, 1997, around 9:30 p.m., police found King's dead body lying face down in an alley near 1745 60th Place in Los Angeles. The cause of King's death was a single gunshot to the back of the head. A Los Angeles Police Department (LAPD) detective arrived after 10:00 p.m., when paramedics had left the scene. The detective recovered two live rounds of .38-caliber ammunition and a white bag holding a .38 revolver with a single cartridge that had been fired. At the autopsy, the detective recovered a bullet removed from King's body, which a ballistics expert determined had been fired by the revolver. Jackson's fingerprints were not found on the gun. Underneath King's body was a photo album with 12 photographs, some of children. Contusions on King's knee were consistent with someone kneeling on the ground. One of the children's T-shirts had a restaurant name on it which the police tracked to Chapel

---

[4] Defense counsel's original filing of the motion for new trial in November 2010 had been rescinded when the trial court granted Jackson's posttrial motion to represent himself. At the November 4, 2011 hearing, Jackson's counsel indicated he did not want to reargue the motion, and the court agreed that Jackson's pro. per. motion for new trial had raised the same issues, which were preserved for appeal.

4

Hill, North Carolina. The Durham, North Carolina police contacted King's husband David King, who identified King's body.[5]

### Events in North Carolina

David testified that he and King lived in North Carolina but had separated, and he had custody of their two children. Before Halloween in 1997, King, who was unemployed, came over to buy costumes for the children, and showed David a first-class plane ticket to Los Angeles. A day or so before her murder, David received a phone call from a distraught King, who asked if he could pick her up at the airport when she came home the next day and said she was in trouble. When David heard that King had been murdered, he contacted the Durham police. Some of the photographs found underneath King's body were of the couple's children.

King had been living with her boyfriend Jamey Hill in a trailer in North Carolina. Hill testified that King told him she flew to California to buy marijuana and brought it back, for $1,000 a trip, and she had made five or six trips in the last couple of months. King showed Hill a suitcase full of marijuana once, and gave him a bag. Before the last trip, King's friend Champion picked King up to take her to the Raleigh-Durham airport. King and Champion came back about an hour and a half later. The women were distraught and crying, and King said someone had stolen a suitcase full of money she was supposed to bring to Los Angeles. Hill told her not to go, but Champion convinced King to fly to Los Angeles and say the airline lost the bag.

Two days after King left for Los Angeles, Champion showed up at Hill and King's trailer with a tall, skinny, black male speaking with a Jamaican accent. Champion asked Hill if he had seen the suitcase. Hill saw from her demeanor that Champion was nervous and wanted him to play along. Hill said he didn't know anything about the bag, and Champion and the man left. The next night, King called, sounding panicky and then abruptly hanging up. Hill called back, and a male voice answered the phone and told Hill he had a wrong number.

---

[5] For simplicity, we will refer to David King as David. No disrespect is intended.

Michael testified that he lived with his brother Terry and his grandmother on Dearborne Street in Durham, North Carolina at the time of the murders. Michael sold cocaine to King and partied with King and Champion, who often had large amounts of money. One night in early November, four or five days before the murders, Michael was in a motel room taking cocaine with Champion and King, who had between $150,000 to $200,000 hidden in a VCR, a suitcase, and other bags. Michael wanted to take the money and run, but King and Champion refused because if anything happened to the money, they would be killed. Champion and Michael left to get some more drugs. When Champion went into a store at a service station, Michael took the suitcase of money and jumped into a cab. Michael gave the money to his family, including $7,700 to Terry. King and Champion went looking for Michael at his home, telling his grandmother "they need the money so they could fly out of here." Michael stayed away from the Dearborne Street house, and when he called home no one answered. When Michael did go home on November 9, 1997, Champion and his brother Terry were lying dead in the bloody living room.

Durham Police Officer Terry Mikels testified that he received a call to respond to the Dearborne house the evening of November 9, 1997. When he arrived at the house after midnight, he found the dead bodies of Terry and Champion, shot multiple times. Champion had been tortured with acid burns on her left breast and arm. Police found 14 expended casings in the area of the bodies. After three or four hours at the Dearborne house, Officer Mikels was called away to a fire at Champion's home nearby, where burn patterns and pour patterns on the floor suggested the use of an accelerant. While investigating the murders and the fire, Durham police interviewed Michael. He appeared scared and admitted that he and Champion had "ripped him off." Michael also told police that he had seen "Pablo" with King and Champion, and had met and sold drugs to Jackson, who he knew as "L.A." and who came to the Dearborne house three or four times with King and Champion. At trial, Michael claimed that he lied when he told the police that he knew Jackson.

6

**Events in California**

On November 6, 1997, in Los Angeles, Jackson rented a white Ford Contour from Mirage Car Rental, on a referral by the Ramada Limited Hotel (Ramada) near LAX. The car was due back on November 9, but was exchanged for another car November 10. The second car was returned November 19.

In November 1997, Sean Hussain was a desk clerk at the Ramada near LAX. Hussain testified that a frequent guest using the name Eric Bartlett, who he also knew as "Rico" and who he identified at trial as Jackson, checked into room 206 on November 6. Jackson was due to check out November 19. On November 7, a woman using the name Crystal McKnight, who Hussain later identified as King, checked into room 214 with a departure date of November 10, saying she was from North Carolina. King was upset because she had lost some bags, and the night she checked in she took the shuttle to the airport twice.

April Newman testified that in 1997 she lived in Los Angeles, and although she had a 1996 conviction for transportation of narcotics, that was for conduct years before and she was no longer involved in transporting drugs. Newman had a sexual relationship with Jackson, whom she knew as "Rico." Newman would meet Jackson at the Ramada. When she met Jackson at the Ramada in November 1997, she met "Christine," who she identified as King. King said she was from North Carolina, and was missing her luggage. Newman drove King to the airport, where King found one bag that was empty. Jackson was also upset because he was expecting money to be in the bag. At one point King told Jackson that she and some friends "partied and spent the money," and, "she didn't know what happened to it"; Jackson was very angry.

In the evening of November 9, 1997, Newman was in Jackson's hotel room with Jackson and King watching the TV show "'Touched By An Angel.'" Jackson said he needed to call his brother. Newman could hear both sides of the conversation conducted in Jamaican patois, which King did not understand. Newman overheard Jackson tell his brother that King admitted that she had "smoked up" his money. Jackson said, "'What does she take me for, why she do this, take mine [*sic*] things?'" Newman heard the man

7

on the other end say he was going to take care of the people in North Carolina who had partied and spent the money: "'I'm going to burn down the place, shoot them.'" Jackson responded that he would do what he had to do, repeating, "'A two shot, she fi get.'" Newman interpreted this as Jackson saying he was going to kill King. Jackson was cleaning a black gun that Newman believed was a semiautomatic handgun, although Newman did not know for certain whether it was a semiautomatic or a revolver. Jackson was angrily muttering and cursing in patois, "'I don't know what she takes me for.'"

After the phone call Jackson said that it was "'time to go.'" As the three were leaving, Jackson said to Newman, "'You're coming with me.'" Alarmed by the phone conversation and the gun, Newman said she had to get back to her daughter. Newman got into her car and watched Jackson get into the driver's seat of his car and drive away with King. Newman later told a detective that when Jackson called her later, he said he "'did her'" or "'dust[ed] her,'" which Newman took to mean that he killed King. She did not remember seeing Jackson again, and left California after her apartment was broken into and she received death threats. Her car was at the Ramada on the day of a November 18 shooting, but she was not present.

On cross-examination, Newman admitted that in 1996 she had been convicted of transporting marijuana through LAX. She also claimed that she did not know how her car got to the Ramada on November 18, and she could not remember where she was on that date. After the police seized her car, she left Los Angeles because she needed the car to get to work. The trial court sustained counsel's objections to the prosecutor's questions whether Newman aided and abetted in King's murder, or fled Los Angeles because she was involved in the murder.

On November 18, 1997, nine days after the police found King's body, Hussain saw Jackson walk into the Ramada lobby and dial a number on the house phone. Three men entered, approached Jackson, and started yelling at him. Jackson and the three men began fighting. Hussain heard a gunshot and saw the three men scatter out of the hotel, and Jackson walked out of the hotel to the parking lot with a pistol in his hand. Hussain

never saw Jackson again. The prosecution showed a hotel security video of the shooting, and Hussain identified Jackson as the man in the video with the gun.

Inglewood police searched Jackson's Ramada hotel room and found two large bricks of marijuana wrapped in cellophane weighing a total of 45 pounds, and more marijuana in a baggie, in the nightstand, in a dresser drawer, and in a black duffle bag. Also in the duffle bag were air freshener, dog repellent, Bounce fabric softener, duct tape, and glue. The Bounce and dog repellent were commonly used to throw drug canines off the scent. The police also found an empty handgun case and a cell phone and two pagers. Horse racing forms and a rental car contract found in the room were variously marked with Jackson's name, California address, date of birth, driver license number and social security number. Jackson's address was a mile away from the alley where King was murdered. Phone records showed that on November 9, 1997, calls were made from Jackson's room to Jamaica and to the North Carolina number of Hill, who lived with King, and to Champion's number.

## II.     Defense Case

Jackson took the stand in his own defense, and testified that he lived in Queens, New York, in 1997, and was not in Los Angeles at any time in 1997. He had never met Newman, and he did not know King or Champion. He did stay at the Ramada once in 1992, but he was not the man involved in the shooting at the Ramada on November 18, 1997. Jackson insisted he did not use or sell drugs and never had, despite admitting to two convictions in Oklahoma for selling narcotics. Jackson also admitted he was arrested in 1994 because marijuana was found in his house in New York, and in 1997 he was arrested in San Bernardino with a small amount of marijuana in a pants pocket. Jackson claimed not to have a brother. On cross-examination Jackson admitted that the paperwork found in room 206 at the Ramada had on it his name, address, date of birth, driver license number and social security number.

In closing argument, Jackson's counsel argued that Newman was an accomplice in King's murder, and Newman's testimony was the only evidence of Jackson's participation in the telephone call that was the agreement to engage in a conspiracy to kill

King and Champion, and of his driving King to the alley and murdering King there. Counsel urged the jury not to believe Newman's testimony, because Newman is "lying and she's covering up her own complicity in this murder charge," suggesting that Newman "likely drove Miss King to her death" although "I'm not saying that she was the shooter." To cover up her own involvement, Newman made things up (including Jackson's later statement that he killed King). Counsel emphasized that there were no fingerprints on the gun, that the path of the bullet was consistent with a shooter other than Jackson, and that the murder weapon was a revolver, although Newman had testified that Jackson was polishing a semiautomatic pistol like the weapon Jackson carried in the videotape after the shooting at the Ramada nine days later.

## DISCUSSION

Jackson contends that because the jury found not true two of the three alleged overt acts in California, the guilty verdict on count 2 failed to meet the elements for a conspiracy conviction. Section 182, subdivision (b) states: "Upon a trial for conspiracy, in a case where an overt act is necessary to constitute the offense, the defendant cannot be convicted unless one or more overt acts are expressly alleged in the indictment or information, nor unless one of the acts alleged is proved; but other overt acts not alleged may be given in evidence." Section 184 requires that some act in addition to the agreement take place in California. Section 184 does not require that the act in California be alleged and proved: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done." Jackson argues that the only California overt act the jury found true was the telephone agreement to murder King and Champion, so that there was no "act, beside such agreement, . . . done within this state" as required by section 184. Jackson argues that therefore his conviction of conspiracy in count 2 constitutes a denial of his right to due process under the state and federal constitution. We disagree.

10

"'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' [Citations.] 'Disagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy.' [Citation.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 120–121 (*Jurado*).)

The evidence that Jackson was involved in a conspiracy to commit murder was overwhelming. The jury found Jackson guilty of entering into an agreement on the telephone on November 9, 1997, in which testimony established he and his brother agreed to murder people in two different states. King's dead body and Champion's and Terry's dead bodies were found in California and in North Carolina respectively on that same date, November 9, 1997. Testimony established that on the day of her murder King, who had failed to deliver to Jackson a suitcase of drug money, was at the Ramada in Inglewood with Jackson. Jackson stated in the telephone conversation that King had admitted that she "smoked up" his money and he would do what he had to do, saying, "'A two shot, she fi get,'" all the while cleaning a handgun; Jackson's brother stated he would shoot the people in North Carolina who had partied and spent the drug money. Jackson drove away from the Ramada with King, subsequently reporting to Newman that King was "dust[ed]." The same day, King's body was found shot in the back of the head in a Los Angeles alley, while Champion's and Terry's bodies were found in North Carolina.

Given this evidence, it is not fatal to Jackson's conviction that the jury found not true that Jackson drove King away from the Ramada with the intent to kill her in the alley, and that he then shot her in the alley. The not true findings do not mean that the jury entirely rejected Newman's testimony regarding Jackson's actions on November 9, 1997 just before King's murder. The jury may have decided it could not find true beyond

11

a reasonable doubt that Jackson committed the two overt acts of driving King to the alley and shooting her in the back of the head. The jury may have believed Newman, who was vigorously cross-examined and revealed to have been a drug mule herself, was also involved in the transportation to the alley and in King's murder. Jackson's attorney made this argument in closing, urging the jurors to conclude that Newman was Jackson's coconspirator and accomplice in King's murder, and her testimony was simply an attempt "to nail her friend Rico." Counsel closed by urging that in the absence of other evidence, the jury was required to find Jackson not guilty on the murder charge.[6]

The jury acquitted Jackson on the King murder charge, count 1, and also found not true the overt acts alleging that Jackson drove King to the alley and murdered her there on November 9, 1997. The jury also, however, found true the overt act that Jackson reached an agreement to kill King and Champion in a telephone conversation with his brother Pablo on the same day that King was murdered. Newman's testimony was the only evidence of the content of the telephone conversation, and the true finding shows that the jury did not entirely reject Newman's testimony. The jury found true other overt acts in North Carolina, including that unidentified coconspirators killed Champion and Terry in North Carolina, also on the same date. It is inconceivable that a jury would conclude that King's murder in California, further linked to North Carolina by the photographs of her children found under her body, was not committed as part of the conspiracy that unfolded on November 9, 1997.

Further, Hussain's testimony supported Newman's testimony that Jackson and King stayed at the Ramada at the same time, that King was looking for her lost bag, and that Newman helped King look for the bag at the airport. The guilty verdict on count 2 shows that the jury found beyond a reasonable doubt that there was a conspiracy to

---

[6] Counsel argued that because Newman was an accomplice, her testimony alone was not sufficient to convict Jackson. The jury was instructed that it could not find Jackson guilty based upon the testimony of an accomplice, who was someone who aided or abetted or was a coconspirator, unless the testimony was corroborated by other evidence tending to connect Jackson with the commission of the offense.

murder. The acquittal on the murder charge and the not true finding on two of the overt acts show that the jury were not convinced beyond a reasonable doubt that Jackson was the driver or trigger puller in King's murder.[7] This was the result of one of Jackson's own defense theories. In addition to arguing that the jury should disregard Newman's testimony because she was an accomplice, Jackson's counsel also pointed out that Newman had testified that Jackson was cleaning a handgun, not a revolver, during the telephone conversation, and that King's fatal wound was from a revolver.

The "not true" findings on the overt acts of driving and shooting King are not inherently inconsistent with the guilty verdict on the conspiracy count, which alleged that Jackson entered into a conspiracy "to commit the crime of [m]urder," without specifying the names of intended victims. Nevertheless, because section 184 requires that some act other than the agreement "be done within this state to effect the object" of the conspiracy, Jackson argues that the agreement did not "amount[] to a conspiracy" under the statute. We disagree. The jury was convinced beyond a reasonable doubt that Jackson was guilty of conspiracy to murder, and found true that he made the agreement to murder King and Champion on the day both women were shot to death. That the jury concluded that they could not find true that Jackson was the driver or shooter in King's murder does not require that we reverse their guilty verdict. King's murder was an act occurring in California on the same day, also in California, that Jackson planned King's murder with his brother on the telephone. In our view, the evidence was conclusive that King's murder was committed by a member of the conspiracy. It was thus beyond question that some act in furtherance of the conspiracy, other than the telephone agreement to commit murder, occurred in California as required by section 184, and "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement."

---

[7] Unlike the overt acts alleged to have occurred in North Carolina, the two overt acts that the jury found not true did not include language that "unidentified co-conspirators" drove King to the alley and shot her there. The jury thus could not find those overt acts true unless it found beyond a reasonable doubt that Jackson, and no other coconspirator such as Newman, drove King to the alley and shot her.

13

(*Jurado*, *supra*, 38 Cal.4th at p. 121.)  "[T]he purpose of the conspiracy was not just furthered but fulfilled—[the intended victim] was actually murdered.  To prohibit a conspiracy conviction for want of a specific overt act under these circumstances would be . . . [citation], absurd." (*People v. Russo* (2001) 25 Cal.4th 1124, 1136.)  California had jurisdiction, and Jackson's conviction of conspiracy was not a miscarriage of justice.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


CHANEY, J.

14